1
2
3
4
5
6
7
8
9          IN THE UNITED STATES DISTRICT COURT
10        FOR THE NORTHERN DISTRICT OF CALIFORNIA
11

12   ARNOLD ANTHONY SILVA, F-86336,          )
13                    Petitioner,            )   No. C 12-1495 CRB (PR)
14        vs.                                )   ORDER DENYING PETITION
                                             )   FOR A WRIT OF HABEAS
15   SCOTT FRAUENHEIM, Warden,               )   CORPUS
16                    Respondent.            )
17   _____)

18        Petitioner, a state prisoner at Pleasant Valley State Prison, seeks a writ of

19   habeas corpus under 28 U.S.C. § 2254 challenging a conviction and sentence

20   from Sonoma County Superior Court.  For the reasons set forth below, the

21   petition will be denied.

22                        **STATEMENT OF THE CASE**

23        On March 29, 2007, a jury convicted Petitioner of second degree murder,

24   gross vehicular manslaughter while intoxicated with four prior convictions for

25   driving under the influence, and leaving the scene of an accident involving death.

26   The court found true allegations that Petitioner had suffered a prior felony strike

27   conviction and a prior serious felony.   On August 23, 2007, the court sentenced

28   Petitioner to 43 years to life in state prison.

Petitioner unsuccessfully appealed his conviction to the California Court of Appeal and the Supreme Court of California. He also unsuccessfully sought habeas relief from the state courts. On November 2, 2011, the Supreme Court of California denied Petitioner's final petitions for state habeas relief.

On February 23, 2012, Petitioner filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 in this Court. Per order filed on June 19, 2012, the Court found that the petition stated cognizable claims under § 2254, when liberally construed, and ordered Respondent to show cause why a writ of habeas corpus should not be granted. After receiving several extensions of time, Respondent filed an answer on April 15, 2013. Petitioner did not file a traverse despite receiving an extension of time to do so by December 4, 2013.

## STATEMENT OF THE FACTS

The California Court of Appeal summarized the facts of the case as follows:

> On February 6, 2007, an information was filed charging [Petitioner] with second degree murder (Pen.Code, § 187, subd. (a), count 1); gross vehicular manslaughter while intoxicated (§ 191.5, subd. (a), count 2); driving under the influence of alcohol causing bodily injury (Veh.Code, § 23153, subd. (a), count 3); and leaving the scene of an accident involving death (Veh.Code, § 20001, subd. (a), count 4). The information alleged as to count 2 that [Petitioner] fled the scene of the crime (Veh.Code, § 20001, subd. (c)) and alleged as to counts 2 and 3 that [Petitioner] had suffered prior convictions for driving under the influence. The information also alleged that [Petitioner] had suffered a prior strike conviction.
>
> At a jury trial, witnesses testified that [Petitioner] was a regular customer at the Wagon Wheel bar (the bar). Jodie Johnson testified that on January 9, 2006, she went to the bar at about 2 p.m. to have lunch and stayed for about 30 to 45 minutes. [Petitioner] arrived at the bar while she was there. When Johnson returned to the bar after work at about 5:30 p.m., [Petitioner] was still there. She asked [Petitioner] to be her partner in a game of pool because she knew from experience that he was a "very good" pool player. However, that day, [Petitioner] played poorly and used the pool table "to basically balance himself while he was trying to shoot." Johnson saw the bartender, "Kat," refuse to serve alcohol to [Petitioner] at some time between 6:30 p.m. and 7 p.m. Johnson testified that [Petitioner] appeared intoxicated when he left the bar. He was "[n]ot able to stand up,

1   not able to hold his balance," and was "very loud." She told him not to
2   drive and to get a ride home. [Petitioner] looked down at her and said, "Do
    you know who I am?" Johnson told him, "I don't care who you are. My
    kids could be on the road. I don't want you driving." [Petitioner] "peeled
3   out" of the parking lot in his "big ... Suburban type dark vehicle" without
    turning the headlights on.

4
5   David Allen testified he arrived at the bar at 4 p.m. and saw [Petitioner]
    there, in what appeared to be an intoxicated state. Allen testified that
    [Petitioner] was "loud, boisterous, [and] obnoxious," and was "moving all
6   over the place," "[u]p and down the bar, just bouncing around."

7   Kathleen Joyce, a bartender at the bar, testified that when she began her
    work shift at 5 p.m. on January 9, 2006, [Petitioner] was already there.
8   [Petitioner] was not one of her favorite customers because "he can be
    really obnoxious and in your face," making her job difficult at times. At
9   some point during her shift, Joyce refused to serve [Petitioner] any more
    alcohol because he was being "antagonistic with other customers." He was
10  "getting in people's faces," was "more boisterous and obnoxious than
    normal" and acting "a little bit crazy." Joyce testified that she served
11  [Petitioner] three beers but took the third beer and poured half of it out.
    Later that evening, Joyce told [Petitioner] "not to be stupid and not to
12  drive," and told him to get a ride from his friend, Luis Velez.

13  Velez testified that when he went to the bar between 4:30 and 5 p.m. on
    January 9, 2006, [Petitioner] was already there. He knew [Petitioner]
14  because they both frequented the bar. By 6 or 6:30 p.m., [Petitioner] was
    "overboard" and more aggressive than usual. Velez saw [Petitioner] drink
15  four to six beers and two to three shots of alcohol. After the bartender
    refused to give [Petitioner] any more alcohol between 6:30 and 7 p.m.,
16  [Petitioner] purchased whiskey shots, ostensibly for Velez and Allen, but
    drank them himself, then left the bar. Velez testified that when he saw
17  [Petitioner] walk toward his Suburban, he told him "it wasn't good idea,
    that he was too drunk to drive, and that he was going to get a ticket or get
18  arrested or kill somebody." Velez offered to give [Petitioner] a ride. Velez
    tried to take [Petitioner's] car keys and the two "struggled around the
19  parking lot for like 15 or 20 minutes, pushing and shoving and things like
    that," until Velez gave up. Velez estimated that [Petitioner] left the
20  parking lot between 6:30 p.m. and 7 p.m., driving at an unsafe speed.

21  City of Santa Rosa police officer Tom Peirsol testified that on January 9,
    2006, he was working undercover in the property crimes narcotic unit. At
22  about 7:55 p.m. that day, he was driving home in a city-issued pick-up
    truck after finishing his work shift. As he drove in the "No. 1 lane," or the
23  "fast lane" at about 70 or 75 miles per hour, he saw in his rearview mirror
    that another car was approaching him in the same lane at a "much greater
24  speed." Peirsol realized this car was not going to go around him, so he
    moved into the next lane to allow the car to pass. Peirsol watched the car
25  swerve within its lane and "ke[pt] an eye on it" as he tried to determine
    whether the driver was driving under the influence and whether he needed
26  to "call this in and see if I can get somebody to stop it." The driver
    appeared to be a white male. After following the car for about a minute,
27

28                                         3

Peirsol watched the car drift into the right lane and strike another car. The speeding vehicle, which was a Suburban, pushed both vehicles off onto the shoulder, up a little hill, and through a chain link fence. Peirsol pulled over and called 911. When he walked over to the Suburban, he saw that the driver's door was open and the left front tire was flat. He heard music playing loudly from the car stereo and smelled alcohol coming from inside the car. He believed the keys were still in the ignition. The driver of the Suburban was gone. He searched for a body, thinking it may have been thrown from the car, but did not find one. He saw a set of legs sticking out from underneath the second car. Someone tried, but was unable, to get a pulse in one of the ankles.

California Highway Patrol (CHP) officer Scott Zwetsloot testified he was dispatched to the accident scene at approximately 8:08 p.m. on January 9, 2006, and arrived approximately ten minutes later. When he arrived, fire trucks and an ambulance were already at the scene. He saw the victim lying on her back next to a Ford Escort (the Ford). He testified that a photograph of the victim lying next to the Ford accurately depicted what he observed at the scene, and the photograph was admitted into evidence. Zwetsloot testified he saw a beer can about ten feet from the Suburban. The lap portion of the Ford seat belt appeared to not have been used.

Ronald Dean Van Stone testified that at about 8 p.m. on January 9, 2006, [Petitioner's] wife, Mary Silva, dropped [Petitioner] off at Van Stone's house. [Petitioner's] wife appeared to be upset with [Petitioner], who "looked like he had been drinking." [Petitioner] told Van Stone that he had just "wrecked his Suburban and he wanted to get out of there, so he ... stopped by." Van Stone testified that [Petitioner] said "he thought he had blacked out" and did not "remember anything except going through a fence" and "w[aking] up after he crashed the car." [Petitioner] was loud and repeated himself, his speech may have been slurred, and he had trouble with his balance. [Petitioner] asked for a beer but Van Stone did not have any. [Petitioner] mentioned he had left some beer and tequila in his car. [Petitioner] talked about various ways in which "he could get out of it," including reporting his car as stolen. [Petitioner] spent the night on Van Stone's couch.

Nanci Miller testified she was living with Van Stone on January 9, 2006. Her brother-in-law, Robert Wyatt, was visiting and was also at their house that day. [Petitioner] unexpectedly showed up in the evening and said "he had just blacked out and went through the fence and rolled the Suburban." He said he left the car because "he was afraid of getting another DUI." [Petitioner] was "staggering, somewhat belligerent" and "[s]lurring his words, just acting obnoxious." He talked about how he would "try to disguise his involvement in what happened to the Suburban," including saying he left it at the park and someone stole it and crashed it. Miller testified she had previously seen [Petitioner] consume a 12-pack of beer, and she believed his level of intoxication on the night of the accident was "much worse."

Robert Wyatt testified that shortly before 8:30 p.m. on January 9, 2006, he was having dinner at Van Stone's house when [Petitioner] arrived.

4

[Petitioner] was loud and appeared to be "heavily intoxicated" and had a strong alcohol smell on his breath. He thought [Petitioner's] balance and coordination were "mostly good." [Petitioner] explained that he had wrecked his truck. Wyatt contacted CHP the following morning.

CHP Sergeant Robert Mota testified he went to [Petitioner's] house at approximately 3:30 p.m. on January 10, 2006. When Mota went inside, he saw [Petitioner] hiding behind the bed in the master bedroom. Mota spoke with [Petitioner] and recorded the conversation. The CD of the conversation was played for the jury.

Gregory Priebe, a senior criminalist with the California Department of Justice Crime Lab in Santa Rosa, testified he analyzed a sample of [Petitioner's] blood on January 13, 2006, which was negative for alcohol. He stated that the body breaks down alcohol at a rate of 0.18 percent per hour and that there would be no alcohol present after 21 hours unless the beginning level was above .37 percent. He also testified to the effects of alcohol on brain function, stating that alcohol affects mental abilities, including the ability to process information, at even low concentrations. He testified that alcohol also impairs motor function and gives the user a "false sense of increased confidence in [his] abilities." Priebe opined that everyone is impaired to drive a vehicle with a .08 percent blood alcohol level and most people are impaired at a .05 percent level.

Edward Lewis, a member of the CHP's Multidisciplinary Accident Investigation Team (MAIT), testified that he inspected the mechanical workings of the two vehicles that were involved in the collision. He found no fault with the Suburban's acceleration system. The brake system was fully functional and other than collision damage, the steering system was fully functional. Lewis found no mechanical defects unrelated to collision damage. Lewis also did not find any failures in the any of the mechanical systems of the Ford.

Sergeant John Blencowe of the CHP testified he was assigned as an investigator for MAIT and conducted an accident reconstruction. His reconstruction showed the Ford went down an embankment and back up before rolling an undetermined number of times and landing on its tires. The Suburban appeared to have struck the Ford from the rear left, sending it out of control. Blencowe did a lamp analysis and concluded that the Ford's lights had been on at the time of the accident. As part of the analysis, he spoke with witness Peirsol who reported that the Ford's tail lamps had been illuminated. Blencowe further testified that the lap and shoulder restrains on the Ford were designed to be used together. The restraint analysis indicated that the shoulder harness failed, but it was unknown whether it had been engaged prior to the accident. Blencowe said it was possible that the harness came off during the accident. He opined that the cause of the collision was unsafe speed and "improper lane position" of the Suburban, and that the driver of the Suburban was at fault.

Michael Jay Lutz testified that in 2000, he was a program specialist at the Drinking Driving Program (DDP), a state-mandated program for individuals who are convicted of driving under the influence. Lutz found

5

three documents related to [Petitioner's] participation in the program during 2000. The first was a scheduling log dated Friday, May 12. According to the scheduling log, it appeared [Petitioner] signed up to participate in DDP on this date. The second was a scheduling log dated September 14, which indicated that [Petitioner] had an appointment for an "exit," which is an event that occurs after participants complete a 15-week program, pay their fees and have their files verified. The third was a "copy of proof of completions" showing that participants cannot complete the program without attending 15 sessions.

Mary Crivellone testified that from May to August 2000, she worked as an instructor and group facilitator for DDP. The program consisted of 15 two-hour sessions that included one session with speakers from Alcoholics Anonymous and 14 other sessions that covered the topics of drinking and driving safety, medical aspects of addiction, addiction in the family, the process of addiction, and "[h]ow you are going to take the knowledge you [gain] and apply it to your life." An attendance roster indicated that [Petitioner's] classes took place on Thursday evenings from May through August 2000. Crivellone testified that when she taught this course during that time, she showed videos illustrating the potentially fatal consequences of drinking and driving and discussed these potential consequences in class. Crivellone discussed with the attendees that if they killed someone while driving under the influence, the likelihood of them being charged with vehicular manslaughter was high. Crivellone could not definitively say whether [Petitioner] was in her class. A copy of [Petitioner's] certified notice of certificate of completion of DDP was admitted into evidence.

Forensic pathologist Kelly Arthur testified she conducted a postmortem examination of the victim on January 11, 2006. Arthur reviewed a photograph and confirmed it accurately depicted the way the victim's body appeared before Arthur conducted an external examination of the body, including its clothing and hair. The photograph was admitted into evidence. Arthur testified that the examination revealed the victim died as a result of traumatic compressional asphyxia, which means "she died literally of being crushed [by the vehicle] so that she couldn't breathe. . . ." On examination by defense counsel, Arthur acknowledged she had made a mistake in October 2006 when she conducted an autopsy on the wrong body in another case.

The parties stipulated that [Petitioner] was convicted of driving with a prohibited level of alcohol in his blood on April 2, 1987, February 5, 1988, March 11, 1990, and December 7, 1990, and was convicted of attempted driving under the influence of an alcoholic beverage on April 6, 1992.

A jury found [Petitioner] guilty as charged and found true the allegations regarding [Petitioner's] prior convictions. The trial court found true the allegation that [Petitioner] had been convicted of a prior strike. [Petitioner] moved for a new trial and also moved to have his prior strike stricken. The trial court denied both requests, and sentenced [Petitioner] to a term of 43 years to life.

6

People v. Silva, No. A118942, 2009 WL 2147811, at *1-5 (Cal. Ct. App. 1 Dist. July 20, 2009).

## STANDARD OF REVIEW

This court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413.

"[A] federal habeas court may not issue the writ simply because the court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court

7

making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed to the dicta) of the Supreme Court as of the time of the state court decision. Id. at 412; Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir. 2003). While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied. Id.

## CLAIMS & ANALYSIS

Petitioner raises nine claims for relief under § 2254: (1) insufficiency of the evidence; (2) improper admission of prior DUI evidence; (3) Brady error; (4) judicial misconduct; (5) disproportionate sentencing; (6) ineffective assistance of counsel; (7) improper admission of photographs of the victim; (8) Miranda violation; and (9) instructional error. The claims are without merit.

### 1.   Insufficiency of the Evidence

Petitioner claims that "neither the prosecution [n]or the defense proved each element beyond a reasonable doubt." See Petition at 58 (dkt. 1). This claim is without merit.

Federal habeas corpus relief is available to a prisoner who claims that the evidence was insufficient to support his state conviction only where, considering the trial record in the light most favorable to the prosecution, "no rational trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 324 (1979). This standard is applied with reference to

the substantive elements of the criminal offense as defined by state law. Id. at 324 n.16; Sarausad v. Porter, 479 F.3d 671, 678-79 (9th Cir. 2007).

If confronted by a record that supports conflicting inferences, a federal habeas court "must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." Jackson, 443 U.S. at 326. A jury's credibility determinations are therefore entitled to near-total deference. Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004). Except in the most exceptional of circumstances, Jackson does not permit a federal habeas court to revisit credibility determinations. Id. at 957-58. Under 28 U.S.C. § 2254(d), a federal habeas court applies the standard of Jackson with an additional layer of deference. Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005). A federal habeas court must ask whether the operative state court decision reflected an "unreasonable application of" Jackson to the facts of the case. Id. at 1275.

The jury found Petitioner guilty of three offenses: second degree murder, gross vehicular manslaughter while intoxicated, and leaving the scene of an accident involving death. The essential elements of the crime of second degree murder are: (1) the defendant committed an act that caused the death of another person; (2) the defendant acted with malice aforethought; and (3) he killed without lawful excuse or justification. CALCRIM 520. Implied malice may be established if: (1) the defendant intentionally committed an act; (2) the natural and probable consequences of the act were dangerous to human life; (3) at the time he acted, he knew his act was dangerous to human life; and (4) he deliberately acted with conscious disregard for human life. Id.

The essential elements of the crime of gross vehicular manslaughter while intoxicated are: (1) the defendant drove under the influence of an alcoholic

beverage while having a blood alcohol level of 0.08 or higher; (2) while driving that vehicle under the influence of an alcoholic beverage, the defendant also committed an infraction; (3) the defendant committed the infraction with gross negligence; and (4) the defendant's gross negligent conduct caused the death of another person.  CALCRIM 590.

The essential elements of the crime of leaving the scene of an accident involving death are: (1) while driving, the defendant was involved in a vehicle accident; (2) the accident caused the death of someone else; (3) the defendant knew that he had been involved in an accident that injured another person [or knew from the nature of the accident that it was probable that another person had been injured]; and (4) the defendant wilfully failed to immediately stop at the scene of the accident.  CALCRIM 2140.

The record shows that there was ample evidence to persuade a rational trier of fact beyond a reasonable doubt that Petitioner was guilty of second degree murder, gross vehicular manslaughter while intoxicated, and leaving the scene of an accident involving death.  See Jackson, 443 U.S. at 324.  The charges were supported by witness and expert testimony which described that: (1) Petitioner had previously attended the Drinking Driving Program (DDP) and learned the potentially fatal consequences from drinking and driving; (2) Petitioner drank heavily at a bar for several hours before the accident; (3) Petitioner drove off in his Suburban despite being reminded of the dangers of drunk driving from fellow patrons; (4) Petitioner drove recklessly and ultimately caused an accident; (5) the accident killed the driver in the other car; and (6) Petitioner immediately left the scene of the accident in which someone died.  See Silva, 2009 WL 2147811, at *1-5.  This sufficiently showed that Petitioner intentionally drove drunk despite knowing the dangers of doing so, and acted with conscious disregard for human

1    life in ignoring his friends' requests to not get behind the wheel, driving at

2    reckless speeds, and ultimately crashing into the victim's car and killing her.  As

3    he had no justification for his conduct, the jury reasonably concluded that

4    Petitioner committed second degree murder and gross vehicular manslaughter.

5    Petitioner had a duty to remain at the scene of the accident as it was probable that

6    someone had been injured during its course.  Because the evidence showed that

7    Petitioner left the scene of the accident, the jury reasonably found that Petitioner

8    violated California law.

9           Petitioner argues:

10         [I]t was never established whether the victim caused the crash because of

11         an unexpected and impulsive slow-down breaking that took place
           generating an unavoidable chain reaction, or if Petitioner just ran into the
           back of the victim's car.  There are no eyewitnesses, there are only

12         witnesses that came up upon the accident after the fact, and could only
           estimate what had taken place.  Without any reconstruction experts, or

13         investigation, there can only be a one-sided story.

14   See Petition at 58.  But evidence presented at trial, including both eyewitness and

15   reconstruction expert testimony, demonstrated that Petitioner, and not the victim,

16   caused the crash.  See Silva, 2009 WL 2147811, at *2, *4.  That the jury accepted

17   the prosecution's version of the facts rather than Petitioner's is of no

18   consequence here.  See Bruce, 376 F.3d at 957-58.

19         Petitioner is not entitled to federal habeas relief on his insufficiency of the

20   evidence claim.  The state courts' rejection of the claim cannot be said to have

21   been objectively unreasonable.  See Plascencia v. Alameida, 467 F.3d 1190,

22   1197-98 (9th Cir. 2006) (applying 28 U.S.C. § 2254(d)).

23         **2.    Admission of Prior DUI Evidence**

24         Petitioner claims that the trial court erred under "California law" in

25   admitting evidence of "prior DUI convictions."  See Petition at 57.  Petitioner

26   further claims that admitting evidence of "prior DUI acts to prove a propensity to

27

28

1  commit the charged offenses" violated his right to due process. Id. Both claims

2  are without merit.

3      As a threshold matter, federal habeas relief is not available for errors of

4  state law. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("[I]t is not the

5  province of a federal habeas court to reexamine state-court determinations on

6  state-law questions."). And even if it was, California law permits the admission

7  of a prior DUI conviction to show gross negligence for the offense of gross

8  vehicular manslaughter while intoxicated. People v. Ochoa, 6 Cal. 4th 1199,

9  1204-05 (1993). In DUI cases where the defendant is charged with second

10  degree murder, California courts often admit evidence of prior driving conduct to

11  demonstrate knowledge and thus prove implied malice. People v. Ortiz, 109 Cal.

12  App. 4th 104, 116 (2003).

13      The Supreme Court has left open the question of whether admission of

14  propensity evidence violates due process. Estelle, 502 U.S. at 75 n.5 (1991)

15  ("[W]e express no opinion on whether a state law would violate the Due Process

16  Clause if it permitted the use of 'prior crimes' evidence to show propensity to

17  commit a charged crime."). Because the Court has left this issue an "open

18  question," a petitioner's due process right concerning the admission of propensity

19  evidence is not clearly established as required by 28 U.S.C. § 2254(d). Mejia v.

20  Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008); Alberni v. McDaniel, 458 F.3d 860,

21  866-67 (9th Cir. 2006).

22      The Ninth Circuit has explained the standard for reviewing constitutional

23  challenges to prior crime evidence. Jammal v. Van De Kamp, 926 F.2d 918, 919-

24  920 (9th Cir. 1991). In Jammal, the court described that the prosecution's

25  evidence will often raise multiple inferences, both permissible and impermissible,

26  and the jury must sort them out with the court's instructions. Id. "Only if there

1  are no permissible inferences the jury may draw from the evidence can its

2  admission violate due process.  Even then, the evidence must 'be of such quality

3  as necessarily prevents a fair trial.'"  Id.

4        Here, the prior DUI evidence served to establish Petitioner's knowledge of

5  the threat to human life posed by drunk driving, and was not used as propensity

6  evidence.  See Answer at 12 (dkt 16-1).  Respondent describes that the jury was

7  instructed that it could not consider the prior DUI evidence for any purpose other

8  than to show knowledge.  Id.  Even if an inference of propensity could be drawn

9  from the evidence, as there are other permissible inferences the jury could have

10  drawn, the admission of the prior DUIs did not violate Petitioner's due process

11  rights.  Jammal, 926 F.2d at 919-20.

12        Petitioner is not entitled to federal habeas relief on his claim of improper

13  admission of prior DUI evidence.  It simply cannot be said that the state courts

14  unreasonably applied clearly established Supreme Court precedent in rejecting

15  the claim.  See Larson v. Palmateer, 515 F.3d 1057, 1066 (9th Cir. 2008)

16  (because Supreme Court expressly reserved question of whether using evidence

17  of prior crimes to show propensity for criminal activity could violate due process,

18  state court's rejection of claim did not unreasonably apply clearly established

19  federal law as required by 28 U.S.C. § 2254(d)).  Nor can it be said that the

20  admission of prior DUI evidence prejudiced Petitioner in light of the

21  overwhelming other admissible evidence against him.

22        **3.   _Brady_ Error**

23        Petitioner claims "prosecutorial misconduct" and a "miscarriage of

24  justice" because the prosecution's reconstruction expert's "reports, charts, and

25  pictures [regarding the speed of the vehicles] were readily available, not days and

26  weeks before trial, but months and months."  Petition at 59.  Petitioner argues

27

28                                           13

1   that "the material in question fall[s] under exculpatory evidence, requiring

2   prosecution to turn over all evidence whether requested or not." Id.

3        In Brady v. Maryland, 373 U.S. 83 (1963), the Supreme Court held that

4   "the suppression by the prosecution of evidence favorable to an accused upon

5   request violates due process where the evidence is material either to guilt or to

6   punishment, irrespective of the good faith or bad faith of the prosecution." Id. at

7   87. The Supreme Court since has made clear that the duty to disclose such

8   evidence applies even when there has been no request by the accused, United

9   States v. Agurs, 427 U.S. 97, 107 (1976), and that the duty encompasses

10  impeachment evidence as well as exculpatory evidence, United States v. Bagley,

11  473 U.S. 667, 676 (1985). Evidence is material if "there is a reasonable

12  probability that, had the evidence been disclosed to the defense, the result of the

13  proceeding would have been different." Cone v. Bell, 556 U.S. 449, 469-70

14  (2009). "A reasonable probability does not mean that the defendant 'would more

15  likely than not have received a different verdict with the evidence,' only that the

16  likelihood of a different result is great enough to 'undermine confidence in the

17  outcome of the trial.'" Smith v. Cain, 132 S. Ct. 627, 630 (2012) (quoting Kyles

18  v. Whitley, 514 U.S. 419, 434 (1995)). But the mere possibility that undisclosed

19  information might have been helpful to the defense, or might have affected the

20  outcome of the trial, is not enough for relief under Brady. United States v. Olsen,

21  704 F.3d 1172, 1184 (9th Cir. 2013).

22       In sum, for a Brady claim to succeed, (1) the evidence at issue must be

23  favorable to the accused, either because it is exculpatory or impeaching; (2) that

24  evidence must have been suppressed by the prosecution, either willfully or

25

26

27

28        14

1    inadvertently; and (3) prejudice[1] must have ensued.  Banks v. Dretke, 540 U.S.

2    668, 691 (2004); Strickler v. Greene, 527 U.S. 263, 281-82 (1999).

3         Petitioner is not entitled to federal habeas relief on his Brady claim.

4    Petitioner does not show that the reconstruction expert evidence was exculpatory

5    or favorable to him, and suppressed.  And even if the evidence was favorable and

6    suppressed, Petitioner does not show that he was prejudiced.  See id.

7         Petitioner specifically contends that the prosecution failed to notify the

8    defense until mid-trial that the accident reconstruction expert estimated a range of

9    speeds for the victim's car of 40 to 70 miles per hour.[2]  20 RT 2972-97.  CHP

10   Sergeant Blencowe testified that Petitioner's car traveled faster than the victim's

11   car, that Petitioner hit the victim's car, and that Petitioner caused the victim to

12   lose control of the car and travel off of the highway.  20 RT 2984-85.  On cross-

13   examination, Petitioner's counsel asked whether the officer's team could

14   calculate the speed of the victim's car.  21 RT 3115.  The officer responded that

15   although his team had some rough calculations, he did not make an estimate in

16   his report because the lack of information resulted in too broad of a range.  21 RT

17   3115.  After Petitioner's counsel insisted on a speed, the best estimate the officer

18   could provide was that the victim's car "was moving in the range of 40 to 70

19   miles per hour" and that Petitioner's car was moving about 20 to 25 miles per

20   hour faster.  21 RT 3115-16.

21         Petitioner's counsel argued that this range should have been provided to

22   the defense as potential Brady material.  21 RT 3120.  The trial court disagreed

23   _____

24        [1] For the purpose of Brady, the terms "material" and "prejudicial" have the same
25   meaning.  United States v. Kohring, 637 F.3d 895, 902 n.1 (9th Cir. 2011).

26        [2] All reports and supporting documents relied on by the accident reconstruction
     expert, Sergeant Blencower, were provided to Petitioner in the Multidisciplinary
27   Accident Investigation Team (MAIT) report.  See Answer at 21.

28                                        15

1   and explained that the officer had not previously calculated a speed range

2   because he could not accurately provide one given the lack of reconstruction

3   information, and only offered one on cross-examination under counsel's

4   insistence. 21 RT 3120. When counsel requested a continuance to obtain its own

5   expert, the court denied the request and described that the officer "did not give

6   any factual basis for the range which he related to you. There were no facts that

7   were disclosed in his testimony that you could then relay to an expert to have him

8   analyze." 21 RT 3316.

9        In Petitioner's motion for new trial, defense counsel "alleged that the CHP

10   was in possession of 'speed data' and a 'speed estimate' of a minimum of 40 mph

11   for the victim's car, which was exculpatory with regard to gross vehicular

12   manslaughter based on gross negligence." 3 CT 552-53. The motion included an

13   analysis from a defense expert, who determined that the victim's car was

14   traveling between 45 to 50 miles per hour. 3 CT 590-91. In support of the

15   prosecution's opposition, Sergeant Blencowe provided a declaration which

16   described that "I did not reach publishable calculations for the [victim's car]" and

17   that "there is nothing in the information that defense counsel obtained post-trial

18   that was unavailable to her or her expert prior to trial." 3 CT 599. The court

19   denied the motion, noting that the defense expert's estimate was within the range

20   Sergeant Blencowe provided at trial, so this evidence was neither new,

21   exculpatory, nor material. 25 RT 3704-06.

22        The state courts reasonably determined that Petitioner failed to meet the

23   requirements for proving a <u>Brady</u> violation. First, the prosecution did not

24   withhold evidence at issue, as the estimate about the victim's speed came out

25   through cross-examination. The defense had access to this information and, in

26   fact, did make use of this information in its closing argument. 22 RT 3405-06.

27

28                                       16

1   Accordingly, the disclosure of the contested evidence was "made at a time when

2   disclosure would be of value to the accused" and falls outside of the scope of a

3   <u>Brady</u> violation.  <u>United States v. Gordon</u>, 844 F.2d 1397, 1403 (9th Cir. 1988).

4       Second, Petitioner failed to show that the evidence regarding speed was

5   exculpatory.  The speed of the victim's car does not affect the evidence showing

6   that Petitioner was driving between 80 and 90 miles per hour, and at least 10

7   miles per hour faster than the highest part of the estimated range of the victim's

8   speed.  19 RT 2811-13.  The overwhelming evidence demonstrates that Petitioner

9   was traveling "obviously much faster" than the victim, and was ultimately

10  responsible for the crash.  Petitioner has not shown that the range of speeds

11  provided by Sergeant Blencowe is favorable to Petitioner's case as required for a

12  <u>Brady</u> violation.

13      Third, even if the victim was traveling at the lower end of the speed range

14  provided by Sergeant Blencowe, there is no indication that such evidence could

15  reasonably be taken to put the whole case in such a different light as to

16  undermine confidence in the verdict.  <u>See</u> <u>Kyles v. Whitley</u>, 514 U.S. 419, 435

17  (1995).  Petitioner's claim is without merit because it is well established that

18  whether a "reasonable probability" exists may not be based on mere speculation

19  without adequate support.  <u>See</u> <u>Wood v. Bartholomew</u>, 516 U.S. 1, 6-8 (1995).

20      Petitioner is not entitled to federal habeas relief on his <u>Brady</u> claim.

21  Under the circumstances, it simply cannot be said that the state courts' rejection

22  of the <u>Brady</u> claims was objectively unreasonable.  <u>See</u> <u>Plascencia v. Alameida</u>,

23  467 F.3d 1190, 1197-98 (9th Cir. 2006) (applying 28 U.S.C. § 2254(d)).

24      **4.**    <u>**Judicial Misconduct**</u>

25      Petitioner claims judicial misconduct based on a variety of decisions and

26  statements made by the trial judge, including: admitting evidence of Petitioner's

27

28                17

1    prior convictions and DUI history, allowing the prosecution to amend

2    information on the first day of trial, allowing the prosecution to keep adding

3    witnesses, instructing the jury regarding propensity, denying a 1050 motion,

4    denying a new trial, denying a <u>Romero</u> motion, denying a concurrent sentence,

5    misstating that Petitioner had anything to do with death of the victim, and telling

6    jurors "this was a case with a death and the person on trial has priors for DUI."

7    Petition at 61.

8      The Due Process Clause guarantees a criminal defendant the right to a fair

9    and impartial judge. <u>See In re Murchison</u>, 349 U.S. 133, 136 (1955). But a

10   petitioner claiming judicial bias must overcome a presumption of honesty and

11   integrity on the part of the judge. <u>See Withrow v. Larkin</u>, 421 U.S. 35, 47 (1975).

12   Moreover, a claim of judicial bias based on improper conduct by a state judge in

13   the context of federal habeas review does not simply require that the federal court

14   determine whether the state judge's conduct was improper; rather, the question is

15   whether the state judge's conduct "rendered the trial so fundamentally unfair as

16   to violate federal due process under the United States Constitution." <u>Duckett v.</u>

17   <u>Godinez</u>, 67 F.3d 734, 740 (9th Cir. 1995) (citations omitted).

18     Petitioner's claim is without merit because the state courts' rejection of the

19   claim cannot be said to have been contrary to, or an unreasonable application of,

20   clearly established Supreme Court precedent, or based on an unreasonable

21   determination of the facts. <u>See</u> 28 U.S.C. § 2254(d). Nothing about the trial

22   judge's rulings or comments in this case demonstrate the requisite "extremely

23   high level of interference by the trial judge which creates a pervasive climate of

24   partiality and unfairness." <u>Duckett</u>, 67 F.3d at 740 (citation and internal

25   quotation marks omitted). After all, "judicial rulings alone almost never

26   constitute a valid basis for a bias or partiality motion." <u>Liteky v. United States</u>,

1   510 U.S. 540, 555 (1994); see also Crater v. Galaza, 491 F.3d 1119, 1132 (9th

2   Cir. 2007) (judge's prediction of guilty verdict based on evidence not bias).

3        **5.**    **Disproportionate Sentencing**

4        Petitioner alleges that he "has suffered a sentence above and beyond any

5   normal guidelines" and that the state courts "did not address the disparity"

6   between Petitioner's sentence and those for similarly situated defendants. See

7   Petition at 62.  To the extent that Petitioner claims an Eighth Amendment

8   violation, Petitioner's claim is without merit.

9        The Eighth Amendment "prohibits imposition of a sentence that is grossly

10  disproportionate to the severity of the crime." Rummel v. Estelle, 445 U.S. 263,

11  271 (1980).  "The Eighth Amendment does not require strict proportionality

12  between crime and sentence," and only invalidates a sentence that is

13  overwhelmingly disproportionate. Ewing v. California, 538 U.S. 11, 23 (2003).

14  Legislatures have "broad discretion to fashion a sentence that fits within the

15  scope of the proportionality principle." Lockyer v. Andrade, 538 U.S. 63, 75

16  (2003).  A sentence will be found grossly disproportionate only in "exceedingly

17  rare" and "extreme" cases. Id. at 73.

18       Petitioner fails to show that the state court's sentence is grossly

19  disproportionate and contrary to clearly established federal law.  Although

20  Petitioner cites a number of cases involving DUIs to support his claim, those

21  cases resulted in manslaughter convictions, not murder.  A jury convicted

22  Petitioner of second degree murder, gross vehicular manslaughter, and leaving

23  the scene of an accident involving death.  In addition, Petitioner had a prior strike

24  conviction and a prior serious felony conviction.  In light of Petitioner's current

25  and prior convictions, Petitioner's 43 years to life sentence is not one of the

26  "exceedingly rare" sentences found to be grossly disproportionate. Cf. Andrade,

27

28                            19

538 U.S. at 73-75 (holding that the defendant's sentence of two consecutive terms of 25 years to life for two current convictions of petty theft with a prior and three prior convictions for residential burglary was not grossly disproportionate).

Petitioner is not entitled to federal habeas relief on his Eighth Amendment claim. The state courts' rejection of the claim cannot be said to have been objectively unreasonable. See Plascencia, 467 F.3d at 1197-98 (applying 28 U.S.C. § 2254(d)).

### 6. Ineffective Assistance of Counsel

Petitioner claims he was denied his right to effective assistance of counsel at trial and on appeal. The claims are without merit.

In order to prevail on a Sixth Amendment claim of ineffective assistance of counsel, a petitioner must establish two things. Strickland v. Washington, 466 U.S. 668, 686 (1984). First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Id. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694.

The Strickland standard applies to claims of ineffective assistance of trial counsel and also appellate counsel. Smith v. Robbins, 528 U.S. 259, 285 (2000); Moormann v. Ryan, 628 F.3d 1101, 1106 (9th Cir. 2010).

### a. Trial Counsel

Petitioner claims that trial counsel was constitutionally ineffective because counsel could not effectively take notes during voir dire due to a hand injury. Petition at 29. In addition, Petitioner alleges that counsel did not competently prepare for trial because she did not produce expert testimony on forensics or

20

1   accident reconstruction. Id. at 29-30.

2       The Supreme Court of California's summary denial of Petitioner's claims

3   of ineffective assistance of trial counsel cannot be said to be an objectively

4   unreasonable application of the Strickland standard.  See 28 U.S.C. § 2254(d);

5   Cullen v. Pinholster, 131 S.Ct. 1388, 1403 (2011) (Strickland framework for

6   analyzing ineffective assistance of counsel claims is considered "clearly

7   established Federal law, as determined by the Supreme Court of the United

8   States" for purposes of 28 U.S.C. § 2254(d) analysis).

9       First, it cannot be said that trial counsel provided deficient representation

10  due to her hand injury.  The record makes clear that counsel received a total of

11  four weeks in continuances between her initial injury and the start of voir dire,

12  and that counsel took notes during voir dire with a modified writing device.  See

13  Answer at 7.  Petitioner has not established deficient performance in counsel's

14  conduct during voir dire.  See Hovey v. Ayers, 458 F.3d 892, 910 (9th Cir. 2006)

15  (noting that even seemingly cursory voir dire is insufficient to constitute deficient

16  performance under Strickland).  After all, there is not even an indication that

17  Petitioner was dissatisfied with the jury as constituted.  Nor has Petitioner

18  established that trial counsel was deficient for not providing a forensics or

19  accident reconstruction expert.  All he offers is speculation.  Under the

20  circumstances, trial counsel's conduct did not fall outside the wide range of

21  reasonable professional assistance.  See Strickland, 466 U.S. at 689 ("[A] court

22  must indulge a strong presumption that counsel's conduct falls within the wide

23  range of reasonable professional assistance").

24      Second, it cannot be said that Petitioner was prejudiced by counsel's

25  performance during voir dire or by counsel's decision not to produce an expert at

26  trial.  "Establishing Strickland prejudice in the context of juror selection requires

27

28

1    a showing that, as a result of trial counsel's [deficient performance], the jury

2    panel contained at least one juror who was biased." See Davis v. Woodford, 384

3    F.3d 628, 643 (9th Cir. 2004).  As Petitioner did not demonstrate that counsel's

4    performance resulted in a biased juror on his jury, the state court reasonably

5    rejected his claim that trial counsel was constitutionally ineffective during voir

6    dire. See Ybarra v. McDaniel, 656 F.3d 984, 1001 (9th Cir. 2011) ("Ybarra has

7    not made the required showing of prejudice under Strickland, because he has not

8    shown that any juror who harbored an actual bias was seated on the jury as a

9    result of counsel's failure to voir dire on the insanity defense.").  To establish

10   prejudice caused by the failure to call an expert witness, a petitioner must show

11   that the proffered expert witness' testimony would have created a reasonable

12   probability that the jury would have reached a verdict more favorable to the

13   petitioner. See Alcala v. Woodford, 334 F.3d 862, 872-73 (9th Cir. 2003).  As

14   Petitioner set forth no expert witness testimony, much less testimony that would

15   have created a reasonable probability that the jury would have reached a verdict

16   more favorable to Petitioner, the state court reasonably rejected his claim that

17   trial counsel was constitutionally ineffective for failing to produce expert

18   testimony on forensics or accident reconstruction. See 28 U.S.C. § 2254(d).

19              **b. Appellate Counsel**

20            Petitioner claims that his appellate counsel rendered ineffective assistance

21   by having a conflict of interest and by failing to raise on direct appeal the

22   ineffective assistance of trial counsel claim raised here. See Petition at 40-41.

23   The claim is without merit.

24            Petitioner has not shown that appellate counsel's performance fell below

25   an objective standard of reasonableness.  Petitioner's conflict of interest

26   argument is based on appellate counsel's refusal to raise various claims on

27

28                                         22

appeal.  That is not a cognizable conflict of interest claim on federal habeas review.  See Cuyler v. Sullivan, 446 U.S. 335, 350 ("[U]ntil a defendant shows that his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance.").  Further, appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  See Jones v. Barnes, 463 U.S. 745, 751-54 (1983); Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Miller v. Keeney, 882 F.2d 1428, 1434 n.10 (9th Cir. 1989).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  See Miller, 882 F.2d at 1434.  Petitioner's appellate counsel's failure to raise the claims raised here did not fall below an objective standard of reasonableness because, as discussed earlier, those claims have no merit.  And for essentially the same reasons, there is no reasonable probability that, if counsel had raised those claims, Petitioner would have prevailed on appeal.  See id. ("Appellate counsel will frequently remain above an objective standard of competence . . . and have caused her client no prejudice . . . because she declined to raise a weak issue.").  Petitioner is not entitled to federal habeas relief on his claim of ineffective assistance of appellate counsel.

### 7.   Failure to Exclude Photographs of the Victim

Petitioner claims that the state court deprived him of due process by allowing the prosecution to introduce two "gruesome" photographs of the victim.  See Petition at 9.  The claim is without merit.

"The admission of photographs lies largely within the discretion of the trial court, whose ruling will not be disturbed on due process grounds in a federal habeas corpus proceeding unless the admission of the photographs rendered the trial fundamentally unfair."  Batchelor v. Cupp, 693 F.2d 859, 865 (9th Cir.

23

1    1982).  In order to justify relief on federal habeas, there must be no permissible

2    inferences the jury may draw from the photographs and the photographs must be

3    "highly inflammatory."  Jammal v. Van de Kamp, 926 F.2d 918, 920-21 (9th Cir.

4    1991).

5          The California Court of Appeal reviewed the trial court's decision to

6    admit photographs of the victim by considering: (1) whether the evidence

7    satisfied the "relevancy requirement" under California Evidence Code section

8    210; and (2) if relevant, whether the trial court abused its discretion under

9    Evidence Code section 352 in finding that the probative value of the photograph

10   was not substantially outweighed by the probability that its admission would

11   create a substantial danger of undue prejudice.  People v. Silva, 2009 WL

12   2147811, at *5 (Cal. Ct. App. 1 Dist. July 20, 2009).  The state appellate court

13   noted that the admission of photographs of a victim "lies within the broad

14   discretion of the trial court when a claim is made that they are unduly gruesome

15   or inflammatory."  Id. (quoting People v. Scheid, 16 Cal. 4th 1, 13 (1997)).  The

16   court described the probative value of the photographs:

17         [A]ppellant was charged with murder and the prosecution had the burden
           of establishing that the victim was killed as a result of appellant's actions.
18         The photograph of the victim lying next to her car was relevant to show
           she died at the scene of the accident. Appellant asserts the photograph was
19         not an "accurate rendition of the accident scene and could not conceivably
           have had any probative value" because it depicted the victim after she had
20         been moved from underneath her car. Although the photograph did not
           depict the scene as it appeared immediately after the accident, it
21         corroborated the testimony of Zwetsloot, who described what he observed
           when he arrived shortly thereafter. The photograph of the victim's body at
22         the pathology laboratory was relevant to show the body was autopsied to
           determine the cause of death, and also corroborated the testimony of
23         forensic pathologist Arthur who testified she conducted an autopsy of the
           victim's body. Both photographs were relevant to show the autopsy was
24         conducted on the correct body. Although appellant asserts the photographs
           were irrelevant because he did not "challenge[ ] in any way" the
25         contentions that the victim died at the scene of the accident or that her
           body was later autopsied at the hospital, the record shows the defense did
26         in fact suggest the autopsy could have been conducted on the wrong
           individual by emphasizing that Arthur had previously conducted an
27

28                                            24

1    autopsy on the wrong body.

2    Id. at **5-6.  The state appellate court concluded that the photographs were "not

3    unduly gruesome for a murder case in which the victim was pinned under her

4    car" and not "likely to inflame the jury into reaching a decision it otherwise

5    would not have reached." Id. at *7.

6        The California Court of Appeal's rejection of Petitioner's claim of

7    improper admission of evidence was not contrary to, or an objectively

8    unreasonable application of, clearly established federal law.  See 28 U.S.C. §

9    2254(d).  There is a rational inference that the jury could draw from the

10   challenged evidence, an inference that is not constitutionally impermissible, and

11   the evidence was not highly inflammatory under the circumstances of a murder

12   case.  See Jammal, 926 F.2d at 920-21.  The admission of the photographs of the

13   victim in this case did not render the trial fundamentally unfair in violation of due

14   process.  Accord Kealohapauole v. Shimoda, 800 F.2d 1463, 1465-66 (9th Cir.

15   1986) (unpleasant video of the victim's autopsy was not so inflammatory as to be

16   constitutionally unfair).  Nor can it be said that Petitioner was prejudiced by the

17   photographs in view the overwhelming other evidence of his guilt.  Petitioner is

18   not entitled to federal habeas relief on his claim of improper admission of

19   evidence.

20       **8.    Miranda Violation**

21       Petitioner claims that the state courts erred in finding that he impliedly

22   waived his Miranda rights in his initial conversation with Officer Mota.  See

23   Petition at 9.  The claim is without merit.

24       Miranda v. Arizona provides that "the prosecution may not use statements,

25   whether exculpatory or inculpatory, stemming from custodial interrogation of the

26   defendant unless it demonstrates the use of procedural safeguards effective to

27

28                                              25

1  secure the privilege against self-incrimination." 384 U.S. 436, 444 (1966).  Once

2  a suspect is advised of his <u>Miranda</u> rights, a suspect may waive them provided the

3  waiver is voluntarily, knowingly and intelligently made. <u>Id.</u> at 479.

4      The California Court of Appeal described the recorded conversation at

5  issue:

6  "[Mota: ] ... Arnie, my name is Robert, an officer with the Highway Patrol,
   obviously. That's Scott. Let me just read this to you here because I, you're
7  in handcuffs, obviously, I have to. You have the rights to remain silent.
   Anything you say may be used against you in a court of law. You have the
8  right to talk with an attorney and have an attorney present before and
   during questioning. If you cannot afford an attorney, one will be appointed
9  free of charge to represent you before and during questioning if you
   desire. Do you understand each of these rights I have explained to you?

10 "[Appellant: ] Yeah.

11

12 "[Mota: ] Okay, Arnie I'd like to talk to you about what happened and I'll
   tell you what's going on, what I know. Ammm, I'd like to give you this
13 opportunity to get this off your chest of what happened last night. Ammm,
   obviously we went out there and it was your vehicle that was involved,
14 and ahhh, I'm just writing down the time here, I'm sorry. 1542 hours.
   Ammm, we had a couple of witnesses that gave us some descriptions.
15 Ammm, do you want to tell me what happened?

16 "[Appellant: ] I fe[ll] asleep at the wheel and when I went off the road, I
   got scared and ran home."

17 Appellant went on to say the accident occurred when he was on his way
   home after spending several hours at his friend Ron's house. Mota said he
18 knew appellant had been drinking alcohol and that he went to Ron's house
   after the accident, and that he wanted appellant to be honest. The
19 following exchange then took place:

20 "[Appellant: ] You think I should contact my attorney? I don't know, I'm
   not sure, I don't know how this works.

21

22 "[Mota: ] You know what? That's, I don't know what you want to do.
   That's up to you.

23 "[Appellant: ] I, I, I want to get this over with. I want to continue my life.

24 "[Mota: ] OK, I'm here, if you want to give me a statement, that's why I'm
   here. If you want to tell me your side of the story, that's why I'm here. I, I,
25 I can't twist your arm and make you tell me your side of the story.

26 "[Appellant: ] Right.

27

28        26

"[Mota: ] Ammm, it's up to you. This is it, ... we're not going to have another chance for you to talk to me.

"[Appellant: ] Right.

"[Mota: ] So, if you want to tell me the truth about what happened last night, this is it. I'd love to get your side of the story because I have other sides of the story, but I don't have yours.

"[Appellant: ] Right. Well, I mean, I don't know what side, I passed out, or, fell asleep."

Appellant said he had "a couple of beers throughout the day" and fell asleep and "just ran, ran" when he "got so scared." He said a friend named Mike picked him up and took him to Ron's house. Mota asked appellant how many DUI schools he has been to, to which appellant responded he had been to and completed two. He acknowledged he was told (at the schools) that drinking and driving is dangerous and that he could kill people if he drank and drove. Later, when told by Mota that a woman died as a result of the accident, appellant became emotional and started to cry.

People v. Silva, No. A118942, 2009 WL 2147811, at *9-10 (Cal. Ct. App. 1 Dist. July 20, 2009).

The California Court of Appeal's determination that Petitioner impliedly waived his Miranda rights during this interview was not objectively unreasonable. See 28 U.S.C. § 2254(d). The Supreme Court has held that "the question of waiver must be determined on the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused." North Carolina v. Butler, 441 U.S. 369, 374-75 (1979) (internal citations omitted). The state court reasonably found that Petitioner does not suffer from any mental disabilities and is "no stranger to the law," as he had been through the criminal justice system on a number of prior occasions. See Silva, 2009 WL 2147811, at *10. It also reasonably found that Petitioner appeared to understand his rights and expressed a willingness to talk to Officer Mota. See id. Petitioner is not entitled to federal habeas relief on his Miranda violation claim because the state court's determination that Petitioner impliedly waived his Miranda rights during his interview cannot be said to be an unreasonable

27

1  application of <u>Butler</u>. <u>See</u> 28 U.S.C. § 2254(d).

2  ### 9.   Instructional Error

3  Petitioner claims that the trial court erred in failing to instruct the jury on

4  involuntary manslaughter as a defense to implied malice. <u>See</u> Petition at 9. The

5  claim is without merit.

6  To obtain federal habeas relief for error in the jury charge, petitioner must

7  show that the error "so infected the entire trial that the resulting conviction

8  violates due process." <u>Estelle v. McGuire</u>, 502 U.S. 62, 72 (1991). The error

9  may not be judged in artificial isolation, but must be considered in the context of

10  the instructions as a whole and the trial record. <u>Id.</u> Petitioner also must show

11  actual prejudice from the error, i.e., that the error had a substantial and injurious

12  effect or influence in determining the jury's verdict, before the court may grant

13  federal habeas relief. <u>Calderon v. Coleman</u>, 525 U.S. 141, 146 (1998) (citing

14  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993)).

15  A state trial court's failure to give an instruction does not alone raise a

16  ground cognizable in federal habeas corpus proceedings. <u>Dunckhurst v. Deeds,</u>

17  859 F.2d 110, 114 (9th Cir. 1988). Due process does not require that an

18  instruction be given unless the evidence supports it. <u>See</u> <u>Hopper v. Evans</u>, 456

19  U.S. 605, 611 (1982); <u>Menendez v. Terhune</u>, 422 F.3d 1012, 1029 (9th Cir.

20  2005). The defendant is not entitled to have jury instructions raised in his or her

21  precise terms where the given instructions adequately embody the defense theory.

22  <u>United States v. Del Muro</u>, 87 F.3d 1078, 1081 (9th Cir. 1996); <u>United States v.</u>

23  <u>Tsinnijinnie</u>, 601 F.2d 1035, 1040 (9th Cir. 1979). Furthermore, the omission of

24  an instruction is less likely to be prejudicial than a misstatement of the law.

25  <u>Walker v. Endell</u>, 850 F.2d 470, 475-76 (9th Cir. 1987). A habeas petitioner

26  whose claim involves a failure to give a particular instruction, as opposed to a

27

28  28

1    claim that involves a misstatement of the law in an instruction, bears an

2    "especially heavy burden." Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.

3    1997) (quoting Henderson v. Kibbe, 431 U.S. 145, 155 (1977)).

4            The California Court of Appeal thoroughly analyzed Petitioner's claim of

5    instructional error:

6       [People v.] Martin [78 Cal. App. 4th 1107, 1117 (2000)] and
        Montana v. Egelhoff (1996) 518 U.S. 37 (Montana), resolve
7       this issue against appellant. In Martin, the court focused on
        the opinion in Montana, in which the United States Supreme
8       Court found that "a defendant's right to have a jury consider
        evidence of his voluntary intoxication in determining
9       whether he possessed the requisite mental state was not a
        'fundamental principle of justice.' As a result, the court held
10      that Montana's statutory ban on consideration of a
        defendant's intoxicated condition in determining the
11      existence of a mental state, which is an element of the
        offense, did not violate the due process clause. [Citations.]"
12      (Martin, supra, 78 Cal.App.4th at p. 1115.) Martin also
        noted the "well-settled principle" reiterated in Montana "that
13      'the introduction of relevant evidence can be limited by the
        State for a "valid" reason....' [Citation.] As long ago as
14      1969, the California Supreme Court recognized the
        commonly held public belief that 'a person who voluntarily
15      gets drunk and while in that state commits a crime should
        not escape the consequences.' [Citation.] The 1982 and 1995
16      amendments to section 22 are a reflection of this public
        perception." (Martin, supra, 78 Cal.App.4th at p. 1116.) The
17      court added: "Several courts have addressed the
        constitutional validity of the legislative enactments
18      abolishing the defense of diminished capacity ... and found
        no due process violation." (Ibid.)

19
        In her concurring opinion in Montana, Justice Ginsburg
20      explained that "[d]efining mens rea to eliminate the
        exculpatory value of voluntary intoxication does not offend
21      a 'fundamental principle of justice,'...." "4 (Montana, supra,
        518 U.S. at pp. 58-59 (con. opn. of Ginsburg, J.), second
22      italics added; accord id. at p. 50, fn. 4 (plur. opn. of Scalia,
        J.) [endorsing legal analysis of Justice Ginsburg's
23      concurring opinion].) Justice Ginsburg also quoted
        approvingly the statement by Justice Souter in dissent that "a
24      State may so define the mental element of an offense that
        evidence of a defendant's voluntary intoxication at the time
25      of commission does not have exculpatory relevance and, to
        that extent, may be excluded without raising any issue of due
26      process." (Id. at p. 59 (conc. opn. of Ginsburg, J.), italics
        added, quoting id. at p. 73 (dis. opn. of Souter, J.).)

27

28                                          29

1  Appellant's due process claim is predicated on his complaint
   that the prosecution was allowed to make use of the
2  inculpatory value of intoxication evidence, while he was
   precluded from making use of the exculpatory value of such
3  evidence to negate implied malice. However, <u>Montana</u>
   recognized and endorsed the asymmetric limitation on the
4  use of intoxication evidence by concluding, as noted, that
   the legislature may eliminate the "exculpatory" value of such
5  evidence, rendering it available and useful to the prosecution
   but not to the defense, without "offend[ing] a 'fundamental
6  principle of justice'...." (518 U.S. at p. 59 (conc. opn. of
   Ginsburg, J.).) Although appellant has couched his argument
7  as a matter of asymmetry, his contention is nevertheless the
   equivalent to that which was addressed and rejected in
8  <u>Montana</u>.

9  <u>People v. Silva</u>, No. A118942, 2009 WL 2147811, at *12-14 (Cal. Ct. App. 1

10 Dist. July 20, 2009).

11        The California Court of Appeal's rejection of Petitioner's instructional

12 error claim was not contrary to, or an unreasonable application of, clearly

13 established Supreme Court precedent, nor was it based on an unreasonable

14 determination of the facts. <u>See</u> 28 U.S.C. § 2254(d). The state appellate court

15 reasonably applied <u>Montana v. Egelhoff</u> in rejecting Petitioner's claim.

16 Petitioner is not entitled to federal habeas relief on his instructional error claim

17 because it simply cannot be said that the state court's rejection of the claim was

18 objectively unreasonable. <u>See</u> <u>Williams</u>, 529 U.S. at 409.

19                              **CONCLUSION**

20        After a careful review of the record and pertinent law, the Court is

21 satisfied that the petition for a writ of habeas corpus must be DENIED.

22        Pursuant to Rule 11 of the Rules Governing Section 2254 Cases, a

23 certificate of appealability (COA) under 28 U.S.C. § 2253(c) also is DENIED

24 because Petitioner has not demonstrated that "reasonable jurists would find the

25 district court's assessment of the constitutional claims debatable or wrong."

26 <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000).

27

28                                    30

1      The clerk shall enter judgment in favor of Respondent, terminate all

2    pending motions as moot and close the file.

3    SO ORDERED.

4    DATED: 4/4/14 _____

5                                          _____
                                           CHARLES R. BREYER
                                           United States District Judge

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27    G:\PRO-SE\CRB\HC.12\Silva, A.12-1495.denial.final.wpd

28                                         31

UNITED STATES DISTRICT COURT

FOR THE

NORTHERN DISTRICT OF CALIFORNIA


ARNOLD ANTHONY SILVA,

        Plaintiff,

   v.

DAREL ADAMS et al,

        Defendant.

_____/

Case Number: CV12-01495 CRB

**CERTIFICATE OF SERVICE**


I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on April 4, 2014, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.


Arnold Anthony Silva F-86336
Pleasant Valley State Prison
C5 131
P.O. Box 8500
Coalinga, CA 93210


Dated: April 4, 2014

                        Richard W. Wieking, Clerk
                        By: Lisa R Clark, Deputy Clerk